Tyrone **THOMAS**, A/K/A Frederick Thompson, Petitioner,

v.

Charles **SCULLY**, Superintendent, Greenhaven Correctional Facility, Respondent.

No. 92–CV–1159 (JS).

United States District Court, E.D. New York.

June 20, 1994.

Tyrone Thomas, pro se.

Linda Cantoni, Asst. Dist. Atty., for Kings County, Brooklyn, NY, for respondent.

## MEMORANDUM AND ORDER

SEYBERT, District Judge:

Petitioner Tyrone Thomas, proceeding *pro se*, petitions the Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner was convicted in 1983, after a jury trial, of various offenses stemming from the fatal shooting of a grocery-store owner during the course of a robbery. He is presently serving four concurrent terms of imprisonment, the longest of which is from twenty years to life.

In this application for collateral relief, petitioner asserts a number of claims. First, he contends that his guilt was not proved beyond a reasonable doubt. Next, he claims that he was denied a fair trial. Specifically, petitioner asserts that the trial court erred by admitting certain photographs and fingerprint cards into evidence, by improperly marshaling the evidence in its instructions to the jury, and by improperly instructing the jury as to (i) the burden of proof with respect to petitioner's alibi defense, (ii) the proper weight to accord circumstantial evidence, and (iii) the standards for felony murder. Further to this point, petitioner asserts that he was denied a fair trial through prosecutorial misconduct on summation, and through the prosecutor's improper cross-examination of his alibi witnesses.

Petitioner also contends that the trial court improperly halted the trial because of the unavailability of a state's witness. By so doing, petitioner asserts that he was subjected to double jeopardy. Petitioner further argues that his appellate counsel ineffectively conducted his direct appeal by failing to raise this issue.

The Court has carefully reviewed the submissions of the parties, as well as the full record of proceedings in the state courts. For the reasons discussed herein, the petition is denied in its entirety.

## BACKGROUND

At petitioner's trial, the prosecution introduced evidence to show that on March 1, 1981 at approximately 8:00 P.M., four males, aged approximately seventeen through twenty, appeared at the entrance to the Friendly Superette at 1908 Church Avenue in Brooklyn, New York. The grocery store was owned by Jack Woo. In addition to Mr. Woo, present in the store at the time was William Fourquet, who was employed there as a clerk. Tr. at 54 (testimony of William Fourquet).

The four youths at the door asked Fourquet if he could let them in so that they could buy a quart of beer. Fourquet told them the store was closed, and repeated himself three times. *Id.* at 55. Mr. Woo, who was behind

the counter, overheard this dialogue and instructed Fourquet to let the youths in. Only one of the young men entered the store; the other three waited outside. *Id.* at 57.

Upon entering the store, the youth proceeded to grab a quart of beer from the refrigerator and brought it to the counter. He then took out a dollar in payment therefor. Upon being informed that the cost of the beverage was $1.09, he asked if he could go outside to get the additional nine cents from his friends. Fourquet then unlocked the door to let the youth out, and held it open for him. *Id.* at 58–59.

Shortly thereafter, the youth returned to the store and placed a gun to Fourquet's head. After Fourquet was pushed to the front of the counter, two other youths came in. With the weapon perched upon Fourquet's temple, the youth told Woo, who was standing behind the counter, to give them the money in the cash register or else he would shoot Fourquet. *Id.* at 60.

In the excitement of the moment, Mr. Woo at first froze, but then composed himself and reached underneath the counter where he kept the money. Woo did not open the cash register because he had already transferred the money below the counter. *Id.* at 60–61.

As Woo reached below to get the money, the youth holding the gun fired two shots, each striking Woo. *Id.* at 61. The gunshots proved fatal as Woo fell to the ground.

Shortly thereafter, Fourquet was pushed to the floor. At this time, one of the youths hopped over the counter and attempted, without success, to open the cash register door. The youth with the gun then commanded Fourquet to open the cash register door. Fourquet, however, was also unable to do so. *Id.* at 63–66. Thereupon, the same youth who had previously failed to unjar the cash register door attempted to pry the door open, first with a steak knife, and then with a machete that was in the store. This effort also proved unsuccessful. *Id.* at 66–68.

Upon abandoning his attempt to pry open the cash register, the youth commanded Fourquet to roll Mr. Woo over, whereupon the youth searched Woo's pockets, including his wallet, and removed approximately five to six hundred dollars in cash. Immediately thereafter, the youths fled the store. *Id.* at 68–69.

Fourquet testified at trial that he was unable to identify positively the three youths in the store, aside from the fact that their skin color was black, they were aged approximately seventeen through twenty, and that their height ranged from approximately five-foot-seven to five-foot-eight. *Id.* at 54, 71.

Following a police investigation, petitioner was charged with two counts of Murder in the Second Degree (N.Y.Penal Law § 125.-25[1] and [3] ), one count of Robbery in the First Degree (N.Y.Penal Law § 160.15[2] ), one count of Criminal Possession of a Weapon in the Second Degree (N.Y.Penal Law § 265.03), and two counts of Criminal Use of a Firearm in the First Degree (N.Y.Penal Law § 265.09[1] and [2] ). His criminal trial was held before a jury in the New York Supreme Court for Kings County.

At petitioner's trial, two forms of evidence were presented tying him to the scene of the crime. First, testimony was presented by Rudolph Harris, a convicted felon who at the time of the trial was serving a sentence of from one-and-a-half to four-and-a-half years upon having pled guilty to an attempted robbery in an unrelated occurrence. Tr. at 88–89 (testimony of Rudolph Harris). Harris testified that there came a time when the petitioner told him that he had "come in money" through his robbery of a store on Church Avenue at which a confederate, named "Buzzy," had shot a man of Chinese descent. *Id.* at 91–92. On cross-examination, Harris admitted that upon speaking with the investigating police officer and an assistant district attorney in connection with the petitioner's alleged comments, the district attorney's office dismissed certain weapon possession charges that had been brought against him in an unrelated matter. *Id.* at 98, 110. Harris also admitted that on an earlier occasion in connection with an unrelated charge, he had lied on the witness stand to protect himself. *Id.* at 109.

Second, fingerprint evidence was presented at trial linking the petitioner to the crime scene. Evidence was presented that the gro-

cery-store counter top, the cash register, and the machete were all dusted for fingerprints. *Id.* at 135–36 (testimony of Detective Anthony Amplo). Testimony was proffered as to ten points of comparison between the fingerprint of petitioner Frederick Thompson and that of the latent prints taken by the police from the cash register in Mr. Woo's grocery store. *Id.* at 197 (testimony of police officer Robert Lohnes). Expert testimony was also proffered that the unknown prints taken from the cash register and the known prints of the petitioner were made by the same person. *Id.* The defense did not call any experts to present an opinion to the contrary. The prosecution's expert, however, testified on cross-examination that the petitioner's fingerprints did not match the prints taken from the machete or the machete blade. *Id.* at 199.

The petitioner testified at his trial and asserted an alibi defense, claiming that at the time of the robbery, he was present at a roller-skating rink with his sister and two friends. *Id.* at 253 (testimony of Frederick Tyrone Thompson). Petitioner's sister and the two friends each testified at trial as to the petitioner's presence with them at the time of the robbery. On cross-examination, it was adduced that none of the alibi witnesses, upon hearing of the petitioner's arrest, came forward to either the police or the assistant district attorney prosecuting the case to inform them of the petitioner's asserted whereabouts at 8:00 P.M. on March 1, 1981—the time of the robbery and fatal shooting for which the petitioner was arrested. *Id.* at 229 (testimony of Melinda Thomas), 239 (testimony of Rena Wilson), 248 (testimony of Jonathan Rogers).

After the defense had rested, the prosecutor moved to reopen the case for the sole purpose of introducing the petitioner's fingerprint card into evidence. *Id.* at 261. The prosecutor claimed that he had inadvertently failed to introduce this item into evidence, and now sought to remedy this omission by filtering the evidentiary foundation therefor through a witness who had testified earlier. The trial court granted this motion, and the

petitioner's fingerprint card was admitted. *Id.* at 262.

Petitioner was convicted on April 21, 1983 of Murder in the Second Degree (felony murder), Manslaughter in the First Degree, Robbery in the First Degree, and Criminal Possession of a Weapon in the Second Degree. Thomas was sentenced to concurrent terms of imprisonment of from twenty years to life on the felony murder count, six to eighteen years on the manslaughter count, six to eighteen years on the robbery count, and five to fifteen years on the weapon possession count.

Thomas appealed the judgment of conviction to the New York State Supreme Court, Appellate Division, Second Department [hereinafter "Appellate Division"]. On direct appeal, petitioner argued that his guilt had not been established beyond a reasonable doubt. He further argued that he had been denied a fair trial (i) through the admission into evidence of certain photographs and fingerprint cards, (ii) through errors in the trial court's instructions to the jury, and (iii) through prosecutorial misconduct in connection with the summation, and in the prosecutor's cross-examination of his alibi witnesses. In addition, Thomas contended that his sentence was excessive.[1]

On March 16, 1987, the Appellate Division unanimously affirmed Thomas's conviction. In an opinion reported at *People v. Thomas,* 128 A.D.2d 743, 513 N.Y.S.2d 69 (1987), the Appellate Division concluded that Thomas's guilt indeed had been proven beyond a reasonable doubt. In particular, the court cited fingerprint evidence that linked Thomas to the crime, and the plausibility of the jury's credibility determinations. *See id.,* 513 N.Y.S. at 69. In addition, the court noted that the absence of timely objection prevented the review of Thomas's contention that the prosecutor had improperly cross-examined the defendant's alibi witnesses with respect to their failure to come forward to the police, or to the district attorney's office, with exculpatory information. Despite this apparent procedural bar to the review of Thomas's claim, the Appellate Division nevertheless acknowledged that any prejudice that Thomas may have suffered through this cross-exami-

---

1. Thomas does not assert any claim concerning his sentence in the instant petition.

nation would have been cured through the trial court's instructions to the jury to disregard this line of questioning. *See id.* at 69–70. Finally, the Appellate Division found Thomas's other contentions to be without merit. *See id.* at 70.

On June 24, 1987, the New York State Court of Appeals denied Thomas's application for leave to appeal.

In 1989, Thomas moved before the Appellate Division for a writ of error coram nobis, claiming that his appellate counsel had represented him ineffectively. Specifically, Thomas contended that his appellate counsel should have raised a double jeopardy claim based on the trial court's declaration of a mistrial before all twelve jurors had been sworn. On December 5, 1989, the Appellate Division denied this motion, and on January 17, 1990, the New York State Court of Appeals dismissed Thomas's application to appeal.

The procedural history of this petition having been set forth above, the Court now turns to address whether it may reach the merits of the petitioner's claims.

## DISCUSSION

I. *Availability of Federal Judicial Review of the Merits of the Petitioner's Claims*

Under 28 U.S.C. § 2254(b), a federal court may not review the substantive merits of an applicant's claims for collateral relief unless "the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b) (1988); *see Rose v. Lundy,* 455 U.S. 509, 510, 102 S.Ct. 1198, 1199, 71 L.Ed.2d 379 (1982); *Blissett v. Lefevre,* 924 F.2d 434, 438 (2d Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 158, 116 L.Ed.2d 123 (1991); *Moloi v. Riley,* 762 F.Supp. 36, 37 (E.D.N.Y. 1991). This requirement is predicated upon principles of judicial comity, and is "designed to protect the state courts' role in the enforcement of federal law and [to] prevent [the] disruption of state judicial proceedings." *See Rose,* 455 U.S. at 518, 102 S.Ct. at 1203.[2]

■ Where a petition contains both exhausted and unexhausted claims, a federal district court ordinarily must dismiss the petition. *See Rose,* 455 U.S. at 510, 102 S.Ct. at 1199. Accordingly, the procedural history of each of the claims asserted within the habeas petition must be reviewed separately to determine whether the exhaustion requirement has been satisfied.[3]

■ The Second Circuit Court of Appeals has formulated a two-prong test for determining whether an applicant for federal habeas relief has exhausted his state remedies. First, the petitioner must have "fairly presented" his federal claim to the state courts. *See Daye v. Attorney Gen.,* 696 F.2d 186, 191 (2d Cir.1982) (en banc). To satisfy this requirement, the petitioner must demonstrate that he has informed the state courts of both the factual and the legal premises of the claim he now asserts in federal court. *See id.* (citing *Picard v. Connor,* 404 U.S. 270, 276–77, 92 S.Ct. 509, 512–13, 30 L.Ed.2d 438 (1971)). Under the law of this circuit, the petitioner need only make a minimal articula-

2. A further requirement for the maintenance of a habeas petition under 28 U.S.C. § 2254 is that the petitioner must be "in custody." The "in custody" requirement is satisfied if the petitioner is presently serving a sentence, or is out of prison on bail, probation, or parole. *See Hensley v. Municipal Court,* 411 U.S. 345, 350–53, 93 S.Ct. 1571, 1574–76, 36 L.Ed.2d 294 (1973). However, the "in custody" requirement is not met by a petitioner whose sentence has fully expired. *See Maleng v. Cook,* 490 U.S. 488, 492, 109 S.Ct. 1923, 1926, 104 L.Ed.2d 540 (1989).

Turning to the instant petition, it is uncontested that Thomas is presently serving concurrent prison sentences. Thus, the "in custody" requirement has been satisfied.

3. For purposes of this threshold analysis, Thomas's claims to the Court for collateral relief may be categorized into three distinct types. First, one of his claims (i.e., his claim that the prosecutor improperly cross-examined his alibi witnesses) was not preserved by contemporaneous objection. Second, certain of his claims (i.e., his claim that his guilt was not established beyond a reasonable doubt, and his other claims concerning whether he received a fair trial) were appealed to the Appellate Division, and thereafter were brought to the attention of the New York State Court of Appeals. Third, certain of his claims (i.e., Thomas's claims of ineffective assistance of appellate counsel, and double jeopardy violation) were appealed to the New York State Court of Appeals through a state habeas petition.

tion of the federal claim to the state courts. *See, e.g., Reid v. Senkowski,* 961 F.2d 374, 376 (2d Cir.1992) (Federal claim was fairly presented where the petitioner filed a *pro se* supplemental brief in state court that cited the Fourteenth Amendment of the United States Constitution, even though no factual premises underlying this claim were asserted, and no cases were cited to. Rather, the reference to the Fourteenth Amendment within the supplemental brief was sufficient to place the state court on notice of the constitutional claims addressed in the brief.).

■ The second prong of this doctrine generally requires the applicant to utilize all available avenues of appellate review within the state-court system before proceeding to federal court. *See Daye,* 696 F.2d at 190. Typically, this criterion requires a direct appeal to the highest court of the state. *See id.* n. 3. This requirement, however, may also be satisfied where the applicant has collaterally attacked the judgment of conviction within the state courts, and thereafter has appealed the denial of his application to the highest court of the state. *See Lloyd v. Walker,* 771 F.Supp. 570, 574 (E.D.N.Y.1991) (Exhaustion requirement met where state collateral review had been obtained through filing of a Motion to Vacate Judgment, pursuant to N.Y.Crim.Proc.L. § 440.10, followed by eventual appeal to New York Court of Appeals.); *Dingle v. Scully,* No. CV–90–1804 (RR), 1990 WL 252285, at *8–*9 (E.D.N.Y. Dec. 31, 1990) (reaching the merits of the applicant's speedy trial claim where state collateral review had been obtained through the filing of a state habeas petition, followed by a subsequent appeal and an application for leave to appeal to the New York Court of Appeals).

■ Apart from the general exhaustion analysis, a federal court generally will be precluded from reviewing any claim included within the habeas petition for which "a state court rests its judgment on an adequate and independent state ground, including a state procedural bar." *Reid,* 961 F.2d at 377. A state procedural bar could arise through a

failure to make a timely appeal, or through a failure to preserve a claim for appeal through contemporaneous objection. *See id.* Recognizing that the habeas petitioner, with respect to such claim, would no longer have any state remedies available to him, the Second Circuit Court of Appeals has held that the inclusion of such claim within a habeas petition will *not* warrant the dismissal of the entire petition. *See Grey v. Hoke,* 933 F.2d 117, 120 (2d Cir.1991) (quoting *Harris v. Reed,* 489 U.S. 255, 263 n. 9, 109 S.Ct. 1038, 1043 n. 9, 103 L.Ed.2d 308 (1989)) ("For exhaustion purposes, 'a federal habeas court need not require that a federal claim be presented to a state court if it is clear that the state court would hold the claim procedurally barred.' "); *Gatto v. Hoke,* 809 F.Supp. 1030, 1035 (E.D.N.Y.), *aff'd,* 986 F.2d 500 (2d Cir.1992).

There are three wrinkles to this doctrine. First, a federal district court may consider the merits of a procedurally barred claim where the petitioner is able to show "cause for the default and prejudice resulting therefrom." [4] *Reid,* 961 F.2d at 377 (quoting *Harris,* 489 U.S. at 262–63, 109 S.Ct. at 1042–44). Second, a procedural default may be excused even without a showing of cause and prejudice if there has been a "fundamental miscarriage of justice" sufficient to allow it to be shown "by clear and convincing evidence that but for a constitutional error, no reasonable jury would have found the petitioner guilty." *Washington v. James,* 996 F.2d 1442, 1447 (2d Cir.1993) (internal quotations omitted), *cert. denied,* —— U.S. ——, 114 S.Ct. 895, 127 L.Ed.2d 87 (1994). Third, " 'a procedural default [will] not bar consideration of a federal claim on . . . habeas review unless the last state court rendering the judgment in the case *'clearly and expressly' states that its judgment rests on a state procedural bar.' "* *Reid,* 961 F.2d at 377 (quoting *Harris,* 489 U.S. at 263, 109 S.Ct. at 1043–44) (emphasis added).

As to this third item, the Second Circuit Court of Appeals has been very strict in requiring a clear and express articulation of

---

**4.** The cause requirement can be met by demonstrating that the factual or legal basis for a claim was not reasonably available to defense counsel at the time the issue should have been raised. *See Amadeo v. Zant,* 486 U.S. 214, 222, 108 S.Ct. 1771, 1776–77, 100 L.Ed.2d 249 (1988).

a state procedural bar in order for federal habeas review to be precluded. It is presumed "that when a federal claim is denied without explicit reliance on state grounds, the merits of the federal claim are the basis for the judgment." *Wedra v. Lefevre*, 988 F.2d 334, 338 (2d Cir.1993). This presumption only will apply, however, " 'when it fairly appears that a state court judgment rest[s] primarily on federal law or [is] interwoven with federal law.' " *Id.* (quoting *Coleman v. Thompson*, 501 U.S. 722, 739, 111 S.Ct. 2546, 2559, 115 L.Ed.2d 640 (1991)).

An example of these principles at work is provided in *Reid v. Senkowski*, 961 F.2d 374 (2d Cir.1992). In *Reid*, the Second Circuit Court of Appeals noted that "[t]he state appellate court summarily disposed of a number of Reid's challenges to his conviction ... as 'either unpreserved for appellate review or without merit.' " *Id.* at 377 (quoting *People v. Reid*, 138 A.D.2d 642, 526 N.Y.S.2d 226, 227 (2d Dep't), *leave to appeal denied*, 72 N.Y.2d 865, 532 N.Y.S.2d 515, 528 N.E.2d 905 (1988). The Second Circuit held that this articulation was insufficient to preclude federal review of this claim because "[t]he state court did not clearly and expressly state whether it had examined the merits of the [pertinent] claim or had relied on a procedural default." *Id.*[5]

■ Turning to the instant petition, Thomas asserts, *inter alia*, that he was denied a fair trial because the prosecutor improperly cross-examined his alibi witnesses with respect to their failure to come forward with exculpatory information to the police, or to the district attorney's office. On his direct appeal to the Appellate Division, Thomas asserted this very claim, even though his counsel had not objected to the prosecutor's conduct at trial. The Appellate Division rejected this claim, employing the following language:

The defendant's contention that the prosecutor improperly cross-examined his alibi witnesses as to their failure to come forward to the police or District Attorney with their exculpatory information has not been preserved for our review. *In any event, during its charge the court instructed the jury that they were to disregard this line of questioning.*

*People v. Thomas*, 128 A.D.2d 743, 513 N.Y.S.2d 69 (2d Dep't 1987) (emphasis added).

Because the Appellate Division, arguably, did not rely explicitly upon the state procedural bar in reaching its judgment, but rather interweaved in its analysis a discussion touching upon the prejudicial effect of the prosecutor's conduct, the Court will regard this claim to be amenable to federal habeas review.[6] *See Wedra*, 988 F.2d at 338. *Compare id.* at 339 (federal habeas review precluded where state appellate court determined that claim, on the basis of a state procedural bar, "is hereby denied," and continued that "[i]f this application for leave to appeal was timely, this court ... would have denied same on the merits").

In addition, each of the other claims that Thomas brought on his direct appeal to the Appellate Division is amenable to review by this Court under the general exhaustion doctrine. The federal constitutional dimensions of these claims are plainly apparent insofar as they center around whether Thomas's guilt was proved beyond a reasonable doubt, and whether Thomas received a fair trial. Accordingly, these claims, too, satisfy the exhaustion doctrine.

■ Finally, the claims that Thomas brought to the Appellate Division in connection with his application for a writ of error coram nobis are amenable to federal habeas

---

5. In contrast, in examining another claim, the Second Circuit in *Reid* found the following language of the state appellate court to constitute an adequate and independent state ground, thereby precluding federal habeas review: "We note that the defendant's *pro se* argument that the trial court failed to give an adequate identification charge is unpreserved for appellate review." *See Reid*, 961 F.2d at 377.

6. The phrase "amenable to review" is used to denote that under *Rose v. Lundy*, 455 U.S. 509, 510, 102 S.Ct. 1198, 1199, 71 L.Ed.2d 379 (1982), *all* of the claims asserted within the habeas petition must be fully exhausted in order for the merits of any of the claims to be reached.

review.[7] In this state habeas petition, Thomas contended that his appellate counsel had represented him ineffectively by failing to raise a double jeopardy claim based on the trial court's alleged declaration of a mistrial before all twelve jurors had been sworn. In setting forth his ineffective-assistance-of-counsel claim, Thomas described at considerable length the legal and factual premises underlying his double jeopardy claim. *See* Ex. C. In light of the petitioner's detailed briefing of the double jeopardy issue within his state habeas petition, and the issue's interweaving within the Appellate Division's resolution of the ineffective-assistance-of-counsel claim, the Court regards both of these claims to have been exhausted for purposes of its threshold analysis. *Cf. Reid,* 961 F.2d at 376 (Minimal reference is required to place the state court on notice of the constitutional claims addressed in the brief.). *See also Dingle,* 1990 WL 252285, at *8–*9 (exhaustion requirement satisfied by filing of a state habeas petition, followed by a subsequent appeal, and an application for leave to appeal to the New York State Court of Appeals).[8]

Having concluded that each of the claims asserted within the instant petition has passed the threshold analysis, the Court shall address the merits of petitioner's claims. Before doing so, however, the Court wishes to address the scope of its review of the state courts' findings of fact and conclusions of law.

II. *Scope of Review of State–Court Findings of Fact and Conclusions of Law*

■ Under 28 U.S.C. § 2254(d), a federal court reviewing a habeas petition generally must presume correct a state-court's findings of fact that have been ascertained through a

hearing on the merits. *See Ventura v. Meachum,* 957 F.2d 1048, 1054 (2d Cir.1992). This presumption is designed to promote the interests of comity. *See id.* Where the presumption applies, the burden rests " 'upon the applicant to establish by convincing evidence that the factual determination by the State court was erroneous.' " *Ventura,* 957 F.2d at 1054 (quoting 28 U.S.C. § 2254(d)).

■ This deferential treatment applies to implied as well as to express findings of fact. *See Ventura,* 957 F.2d at 1055 (citing *Marshall v. Lonberger,* 459 U.S. 422, 433–34, 103 S.Ct. 843, 850–51, 74 L.Ed.2d 646 (1983)). Further, it applies to findings of state appellate courts, as well as to findings of state trial courts. *See id.* Moreover, this presumption applies not only to the "historical facts" developed at trial, but also to the factual inferences drawn by a state appellate court. *See id.* (citing *Parker v. Dugger,* 498 U.S. 308, 319–20, 111 S.Ct. 731, 739, 112 L.Ed.2d 812 (1991)).

■ There are limitations, however, upon the deference accorded to state-court findings of fact. First, as the nomenclature implies, this deference applies only to findings of *fact.* It does not extend to state-court findings on issues of *law.* A de novo standard of review also applies "to state-court findings on mixed issues of fact and law, such as whether a plea agreement was entered into voluntarily, or whether there has been ineffective assistance of counsel." *See id.* (citing *Strickland v. Washington,* 466 U.S. 668, 698, 104 S.Ct. 2052, 2070, 80 L.Ed.2d 674 (1984) (ineffective assistance of counsel); *Marshall,* 459 U.S. at 431–32, 103 S.Ct. at 849–50 (plea agreement); *Matusiak v. Kelly,* 786 F.2d 536, 543–44 (2d Cir.), *cert. dismissed,* 479 U.S. 805, 107 S.Ct. 248, 93 L.Ed.2d 172 (1986) (plea agreement)).

---

**7.** As was the case with each of the claims asserted in the instant petition, Thomas's subsequent application to appeal from the Appellate Division was denied by the New York State Court of Appeals.

**8.** The Court notes that under *Granberry v. Greer,* 481 U.S. 129, 133, 107 S.Ct. 1671, 1674–75, 95 L.Ed.2d 119 (1987), a federal district court, in appropriate circumstances, may elect not to dismiss a habeas petition containing any unexhaust-

ed claims where the respondent has failed to raise the issue of the petitioner's non-exhaustion of remedies. Because the respondent has not contested petitioner's exhaustion of state remedies, this constitutes an alternative ground for reaching the merits of certain of the petitioner's claims. *See id.* at 135, 107 S.Ct. at 1675–76. *See also Washington v. James,* 996 F.2d 1442, 1448 (2d Cir.1993) (procedural default generally may not be excused under *Granberry* ), *cert. denied,* —— U.S. ——, 114 S.Ct. 895, 127 L.Ed.2d 87 (1994).

954

Second, 28 U.S.C. § 2254(d) establishes eight exceptions whereby deference will not be accorded to a state-court's findings of fact. Most notably, the eighth exception abrogates any deferential treatment where the following three conditions exist: (i) the petitioner challenges the "sufficiency of the evidence to support [a particular] factual determination," (ii) the pertinent parts of the record have been produced for review by the Federal court, and (iii) "the Federal court on a consideration of such part of the record as a whole concludes that such factual determination is not fairly supported by the record." 28 U.S.C. § 2254(d) (1988).

■ Accordingly, to the extent that the state courts have made findings of facts, such findings will not be disturbed provided that they are supported by the record. *See Ventura,* 957 F.2d at 1054–55. In contrast, the legal conclusions attending these factual findings will be reviewed *de novo* by this Court. *See id.* at 1055. As can be observed from the foregoing discussion, regardless of the scope of review to be applied, a careful examination of the record is warranted.

III. *Analysis of the Merits of the Petitioner's Claims*

A. **Sufficiency of the Evidence**

Petitioner asserts that the evidence adduced at his trial was insufficient to sustain his convictions. Specifically, petitioner alleges the following evidentiary inconsistencies:

(1) Petitioner asserts that contradictory testimony was offered by two separate witnesses with respect to whether the cash drawer was open at the scene of the crime.

(2) Petitioner claims that his fingerprints were found only on the cash drawer, and that this is inconsistent with any alleged involvement in prying open a door, or holding a machete.

(3) Petitioner alleges that evidence of an unknown third-party's fingerprints was neither explained nor investigated.

(4) Petitioner claims that the police officer at the scene of the crime testified that he believed that the perpetrator was between four to five inches shorter than the petitioner.

(5) Petitioner asserts that Rudolph Harris—a witness for the prosecution—had an interest in testifying falsely against him because he had a deal with the police, as well as a grievance against the petitioner.

(6) Petitioner alleges that said Harris was an admitted perjurer.

(7) Petitioner asserts that the brutality of the murder for which he was implicated was inconsistent with his good character and general law-abidedness.

Viewed against the record, petitioner's first, second and fourth assertions bear on the jury's evaluation of conflicting evidence. *See* Tr. at 64–66, 165 (first assertion), 197, 199 (second assertion), 122 (fourth assertion). Petitioner's third and seventh assertions, meanwhile, attack the inferences that the jury has drawn from the evidence. *See id.* at 199 (third assertion). Last, petitioner's fifth and sixth assertions assail the credibility accorded to the testimony of a particular witness. *See id.* at 109, 112, 253, 256.

■ "A habeas petitioner challenging the sufficiency of the evidence supporting his conviction bears a heavy burden." *Harrell v. Keane,* No. CV 91-4604 (RR), 1993 WL 416551, at *7, (E.D.N.Y. Oct. 6, 1993) (citing *Reddy v. Coombe,* 846 F.2d 866, 868–69 (2d Cir.), *cert. denied,* 488 U.S. 929, 109 S.Ct. 316, 102 L.Ed.2d 334 (1988); *Liberta v. Kelly,* 839 F.2d 77, 80 (2d Cir.), *cert. denied,* 488 U.S. 832, 109 S.Ct. 89, 102 L.Ed.2d 65 (1988)). In order to obtain federal habeas relief, the district court must find, "after viewing the evidence in the light most favorable to the prosecution, [that no] rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). In making this assessment, a federal district court must defer to the jury's resolution of the weight given to conflicting evidence, the credibility accorded to the testimony of witnesses, and the inferences drawn from the evidence. *See Mallette v. Scully,* 752 F.2d 26, 31 (2d Cir.1984). The jury's determination of guilt may not be disturbed

if the jury has resolved these issues in a reasonable fashion. Moreover, the fact that not all of the inferences drawn from circumstantial evidence were inevitable does not negate the sufficiency of the evidence to prove the defendant's guilt beyond a reasonable doubt. *See United States v. Brown,* 776 F.2d 397, 403 (2d Cir.1985), *cert. denied,* 475 U.S. 1141, 106 S.Ct. 1793, 90 L.Ed.2d 339 (1986). Indeed, as the Supreme Court has noted, the pertinent "inquiry does not focus on whether the trier of fact made the *correct* guilt or innocence determination, but rather whether it made a *rational* decision to convict or acquit." *Herrera v. Collins,* —— U.S. ——, ——, 113 S.Ct. 853, 861, 122 L.Ed.2d 203 (1993) (emphasis in original).

■ Turning to the instant petition, a review of the trial record reveals that the jury had a rational basis for finding the petitioner guilty of each of the crimes for which he was convicted. As discussed *supra,* Thomas was linked to the scene of the crime through a matching of his fingerprints to prints taken from the cash register in the grocery store in which Jack Woo was killed. Moreover, a witness testified that the petitioner admitted to him his participation in the robbery that resulted in Mr. Woo's death. The Court cannot say in view of the record that the jury lacked a rational basis for finding the petitioner guilty of the crimes for which he was convicted. Accordingly, petitioner's claim that there was insufficient evidence to support his convictions must be denied.

## B. Fair Trial Claims

Petitioner contends that he was denied a fair trial as a result of the cumulative effect of errors made by the trial court. Specifically, petitioner asserts that his right to a fair trial was abridged through the trial court's improper admission into evidence of certain photographs and fingerprint cards, and through its improper instructions to the jury as to (i) the burden of proof with respect to petitioner's alibi defense, (ii) the proper weight to accord circumstantial evidence, and (iii) the standards for felony murder. In addition, petitioner asserts that his due process rights were further violated through

prosecutorial misconduct on summation, and through the prosecutor's improper cross-examination of his alibi witnesses. The Court will address each of these assertions in turn.

### 1. *Admission into Evidence of Photographs of the Deceased*

Petitioner contends that the trial court, over the defense counsel's objection, erred by admitting into evidence certain enlarged photographs, including photographs of the deceased which were taken at the crime scene. *See* Tr. at 38, 39. Petitioner argues that the prejudicial effect of these photographs deprived him of a fair trial.

■ It is well established that an erroneous evidentiary ruling ordinarily will not rise to the level of constitutional error sufficient to warrant the issuance of a writ of habeas corpus. *See Taylor v. Curry,* 708 F.2d 886, 891 (2d Cir.), *cert. denied,* 464 U.S. 1000, 104 S.Ct. 503, 78 L.Ed.2d 694 (1983). Rather, in order for a writ of habeas corpus to issue as a result of an erroneous evidentiary ruling, the petitioner must show that the evidentiary ruling " 'had [a] substantial and injurious effect or influence in determining the jury's verdict.' " *Brecht v. Abrahamson,* —— U.S. ——, ——, 113 S.Ct. 1710, 1722, 123 L.Ed.2d 353 (1993) (quoting *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946)); *see also Blissett v. Lefevre,* 924 F.2d 434, 439 (2d Cir.) (relevant inquiry whether error deprived petitioner of a fundamentally fair trial), *cert. denied,* —— U.S. ——, 112 S.Ct. 158, 116 L.Ed.2d 123 (1991). An error of constitutional magnitude "may be found to have had such an effect even if absent the error, the evidence was sufficient to support the conviction." *Henry v. Speckard,* 22 F.3d 1209, 1215 (2d Cir.1994) (citing *Moore v. United States,* 429 U.S. 20, 22, 97 S.Ct. 29, 30, 50 L.Ed.2d 25 (1976)).

■ Petitioner has not demonstrated that he was deprived of a fundamentally fair trial, because even if it were erroneous to admit the evidence in question, a review of entire record does not reveal that its admission "had [a] substantial and injurious effect or influence in determining the jury's verdict." *Brecht,* —— U.S. at ——, 113 S.Ct. at 1722.

Of greatest concern to the petitioner was a photograph that showed the deceased lying behind the counter. Foundation testimony was presented by the police officer summoned to the crime scene that the photograph represented a fair and accurate depiction thereof. Tr. at 38. The record does not indicate, and petitioner does not contend, that this particular photograph was gory or of such inflammatory content as to distract the jury from the issue of Thomas's guilt or innocence. Further, a review of the trial record reveals that each of the photographs in question was properly authenticated and of significant probative value in clarifying police and eyewitness testimony about the locations of objects and people at the crime scene. Therefore, the Court is unable to conclude that the admission into evidence of any of the photographs deprived the petitioner of a fundamentally fair trial.

### 2. Reopening of Prosecution's Case to Admit Evidence of Fingerprint Cards

■ Petitioner next contends that he was denied a fair trial because the trial court permitted the prosecutor to reopen the state's case, after both the prosecution and the defense had rested, for the limited purpose of admitting the defendant's fingerprint card into evidence. The evidentiary foundation for this item's admission was provided by Police Officer Lohnes, who earlier in the trial had testified at length regarding certain fingerprint evidence using the card, which had only been marked for identification. Tr. at 261–67. Respondent contends that Thomas suffered no prejudice through the reopening of the state's case to admit the card because (i) the card was essential to allow the jury to make its own comparison of Thomas's fingerprints with the latent fingerprint found at the scene, and (ii) in any event, the defense was permitted to cross-examine Officer Lohnes regarding the card.

A trial court has considerable discretion to allow the prosecution to reopen its case after the defense has rested. See United States v. Burger, 739 F.2d 805, 809–10 (2d Cir.1984). In light of the record which reveals that the defense was given ample opportunity to cross-examine Officer Lohnes regarding the

probative value of the fingerprint card, Tr. at 264–67, the Court is satisfied that the trial court acted properly in allowing the prosecution to reopen its case.

### 3. Jury Charge with respect to Burden of Proof for Alibi Defense, the Marshaling of Evidence, and Circumstantial Evidence

Petitioner also contends that the trial court improperly instructed the jury with respect to the burden of proof applicable to his alibi defense, and improperly marshaled the evidence within its charge in discussing the counts of the indictment. Petitioner further asserts that the trial court improperly instructed the jury regarding the appropriate weight to accord circumstantial evidence.

The Court is unable to find any errors of constitutional dimension in the trial court's instructions to the jury with respect to these three items.

First, a review of the record reveals that the trial court's instructions clearly explained the People's burden of proving the defendant's guilt and disproving the alibi defense beyond a reasonable doubt. Tr. at 320–21.

■ Nor did the trial court unfairly marshal the evidence. The court even-handedly reviewed the evidence for both sides. Id. at 327–29. Moreover, the court's discussion of the indictment referred the jury to the counts thereof, and did not suggest that inferences should be drawn from the existence of the indictment. Id. at 305, 323, 329, 332, 337, 341. Further, before reviewing the evidence, the court was careful to explain to the jury that it was the jury's recollection of the evidence that was controlling. Id. at 329.

■ Finally, the Court does not consider the petitioner to have been denied a fair trial through the trial court's discussion of circumstantial evidence. In discussing direct and circumstantial evidence, the trial court addressed the jury as follows:

Our law makes no distinction between direct and circumstantial evidence. Any issue and fact in a criminal case may be proven by circumstantial evidence. To prove that fact, there must be positive evidence of some fact which though true

does not answer the question in dispute, but affords a reasonable supposition of its existence. The fact or facts upon which a supposition is to be based must be proved by word and is not to rest in conjecture or suspicion. When facts are shown, it must appear that the supposition drawn is the only one that can be fairly and reasonably drawn from them. That any other explanation is in fairness and reason is not to be accepted. If the fact or facts proved permit you to draw either one of two inferences, one that reasonably supports the conclusion that the defendant did as he was charged and the other that he did not; then you must draw that one favorable to him. For in a criminal prosecution, he is entitled to every reasonable doubt. *As to circumstantial evidence in this case, you may consider the evidence offered by two of the People's witnesses purporting to prove that the fingerprints found at the scene of the crime were those of the defendant.*

*Id.* at 313–14 (emphasis added). The Court presumes that the petitioner, in assailing the trial court's discussion of circumstantial evidence, is referring to the emphasized sentence. The Court acknowledges that when viewed in isolation, the challenged instruction could conceivably lead the jury to apply the wrong standard, and that therefore this portion of the charge may be inappropriate.

"When determining if a constitutional right has been violated, however, a reviewing court should not view a challenged instruction alone." *Mullings v. Meachum,* 864 F.2d 13, 16 (2d Cir.1988). " '[A] single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge.' " *Id.* (quoting *Cupp v. Naughten,* 414 U.S. 141, 146–47, 94 S.Ct. 396, 400–01, 38 L.Ed.2d 368 (1973)). Thus, the appropriate inquiry "is whether a reasonable juror, after hearing the entire charge, would have believed that the state need only show that it was more probable than not" that the fingerprints found at the scene of the crime were the defendant's. *Id.* The Court finds that "the instructions to the jury, when viewed in their entirety, could not reasonably have altered the state's burden of proof." *Id.*

On at least twenty different occasions, the trial court informed the jury that it was the state's burden to prove the elements of the crime charged beyond a reasonable doubt. The challenged instruction, in contrast, was given only once, during the court's explanation of the general principles applicable to the case. In addition, the two sentences that preceded the challenged instruction admonished the jury to draw every reasonable inference in favor of the defendant. Moreover, on the critical issue of identity, the court carefully instructed the jury regarding the state's burden. Tr. at 326. Therefore, viewing the instructions in their entirety, "a reasonable jury could not have understood the state's burden to be anything other than beyond a reasonable doubt." *Mullings,* 864 F.2d at 16.

Thus, the Court finds that Thomas was not denied a fair trial through the trial court's instructions to the jury with respect to the burden of proof applicable to an alibi defense, the marshaling of evidence within the jury charge, and the appropriate weight to accord circumstantial evidence.

### 4. *Jury Charge with respect to Felony Murder*

Petitioner further contends that he was denied a fair trial through the trial court's instructions to the jury on the felony murder count. Specifically, petitioner argues that the trial court erred in instructing the jury that he could be found guilty on this count even if the jury did not find that he was the perpetrator who fatally shot the victim. Respondent, in turn, argues that the trial court properly instructed the jury that the defendant, to be convicted of felony murder, need not have killed the victim so long as he intended to commit the underlying crime. Neither the petitioner nor the respondent explicitly address the trial court's absence of instructions to the jury concerning the affirmative defense to felony murder.

Under New York law at the time of the relevant acts, a felony murder is committed when a person acting alone or in concert with others commits a "robbery ... and, in the course of and in the furtherance of such

crime ... he, or another participant, if there be any, causes the death of a person other than one of the participants...." N.Y.Penal Law § 125.25[3]. "Unlike the crime of intentional murder, in order to support a conviction for felony murder it need not be established that the defendant acted with intent to cause death; the only intent required to be proven is the intent to commit the underlying felony." *People v. Diaz*, 177 A.D.2d 500, 501–02, 576 N.Y.S.2d 144, 145 (2d Dep't 1991) (internal quotations omitted), *leave to appeal denied*, 596 N.E.2d 413, 79 N.Y.2d 1048, 584 N.Y.S.2d 1015 (1992)).

Where the defendant was not the only participant in the underlying crime, an affirmative defense to felony murder is available if he can prove by a preponderance of the evidence that he:

(a) Did not commit the homicidal act or in any way solicit, request, command, importune, cause or aid the commission thereof; *and*

(b) Was not armed with a deadly weapon, or any instrument, article or substance readily capable of causing death or serious physical injury and of a sort not ordinarily carried in public places by law-abiding persons; *and*

(c) Had no reasonable ground to believe that any other participant was armed with such a weapon, instrument, article or substance; *and*

(d) Had no reasonable ground to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury.

N.Y.Penal Law § 125.25[3] (emphasis added). "A court may refuse to submit the [affirmative] defense to the jury—and constitutional error undermining the [affirmative] defense is likewise harmless—if no reasonable view of the properly admitted evidence would permit the jury to find that the defendant had met his burden on each and every element." *Thompson v. Kelly*, 22 F.3d 450, 453 (2d Cir.1994) (citing *Diaz*, 177 A.D.2d at 502, 576 N.Y.S.2d at 145).

A review of the record reveals that the trial court properly instructed the jury on the felony murder count. The trial court correctly informed the jury of the four distinct elements of felony murder in light of the allegations set forth in the indictment (i.e., (i) commission of an enumerated felony, (ii) causing death of another person, (iii) in the course and in the furtherance of the enumerated felony, and (iv) the person killed was not a participant in the enumerated felony). Tr. at 329–32. Moreover, the trial court properly instructed the jury that in order to convict the defendant on this count, each of these elements had to be proved beyond a reasonable doubt. Tr. at 332.

Further, the petitioner was not entitled to a jury instruction concerning the affirmative defense to felony murder because "no reasonable view of the properly admitted evidence," *Thompson*, 22 F.3d at 453, would have permitted the jury to find that Thomas had established the third element of the affirmative defense: that he "[h]ad no reasonable ground to believe that any other participant was armed with" a deadly weapon. N.Y.Penal Law § 125.25[3](c). According to the evidence introduced at trial, it was not until one of the youths had brandished a gun that two of his confederates entered the store. Tr. at 60. After the victim was fatally shot, the youths then tried in vain to pry open the cash register door, and settled ultimately to removing several hundred dollars from the victim's wallet. *Id.* at 63–69. Petitioner was also convicted for this robbery at his trial. Moreover, petitioner introduced no evidence to show that although he may have been present at the crime scene, he had no reasonable ground to believe that another participant was armed with a gun. Rather, petitioner asserted an alibi defense—and as to this, the trial court properly instructed the jury that the burden fell upon the *prosecution* to disprove petitioner's alibi defense *beyond a reasonable doubt. Id.* at 320–21. Thus, the Court finds that the trial court properly instructed the jury on the felony murder count.

### 5. *Prosecutorial Misconduct on Summation*

Petitioner also argues that he was denied a fair trial through prosecutorial misconduct on summation. Specifically, petitioner asserts

that the prosecutor, in his summation, impermissibly told the jury that the defendant was the man whom Mr. Fourquet, the clerk at the grocery store, observed trying to pry open the cash register door. Petitioner contends that the prosecutor misstated the evidence by referring to the defendant as "M3," i.e., the third alleged perpetrator in the store. Petitioner objects to this reference because Fourquet testified at trial that he was unable to identify any of the perpetrators, aside from their skin color, approximate age, and approximate height. Tr. at 54, 71.

The relevant portion of the prosecutor's summation follows:

> Mr. Fourquet tells you that M3, this defendant, grabbed the inside of that drawer with his hand and tried to pull it down. And it just so happens that a print of the left hand is on the inside of that panel. Mr. Fourquet likewise told you that he was forced to assist the defendant in trying to pull it down and lo and behold his print is there.

*Id.* at 294.

 "In order to reach the level of a constitutional violation, a prosecutor's remarks must 'so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process.'" *Gonzalez v. Sullivan,* 934 F.2d 419, 424 (2d Cir.1991) (quoting *Donnelly v. DeChristoforo,* 416 U.S. 637, 643, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974)). "A criminal conviction will not be overturned on the basis of a prosecutor's remarks in an otherwise fair proceeding." *Gatto v. Hoke,* 809 F.Supp. 1030, 1040 (E.D.N.Y.) (citing *United States v. Young,* 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985)), *aff'd,* 986 F.2d 500 (1992). Rather, prosecutorial misconduct during summation must cause "substantial prejudice" to the defendant to warrant a reversal on this ground. *Gonzalez,* 934 F.2d at 424 (quoting *United States v. Tutino,* 883 F.2d 1125, 1136 (2d Cir.1989), *cert. denied,* 493 U.S. 1081, 110 S.Ct. 1139, 107 L.Ed.2d 1044 (1990)). The factors the Court must consider include the prejudicial ramifications of the misconduct, the measures adopted by the trial court to cure the misconduct, and the certainty of conviction absent the prejudicial conduct. *See id.* (citing *United States*

*v. Modica,* 663 F.2d 1173, 1181 (2d Cir.1981), *cert. denied,* 456 U.S. 989, 102 S.Ct. 2269, 73 L.Ed.2d 1284 (1982)).

 The Court finds that the prosecutor's summation did not affect the jury's ability to judge the evidence fairly. *See id.* It is clear to the Court that the prosecutor's prior reference to "M3" before mentioning the defendant placed the jury on notice that he was merely drawing an inference that the person Fourquet was referring to was indeed the defendant. Thus, this portion of the summation was not inappropriate. Furthermore, even if this portion of the summation were regarded as an improper reference to a matter not in evidence, *see Wanton v. Mann,* 91 Civ. 4950 (LBS), 1992 WL 142048, at *4 (S.D.N.Y. June 10, 1992), the substantial prejudice necessary to overturn petitioner's conviction still would be lacking because of the statement's isolated scope, the strength of the state's case against the defendant, and moreover, because of the trial court's curative instruction to the jury that the jury's recollection of the evidence controls. This instruction was administered by the trial court both before and after the prosecutor gave his summation. Tr. at 273, 304. Therefore, on either of these grounds, the Court finds that the prosecutor's summation did not render the petitioner's trial fundamentally unfair.

### 6. *Prosecutorial Misconduct in Cross-Examining of Alibi Witnesses*

 Petitioner also contends that he was denied a fair trial through the prosecutor's cross-examination of the defendant's alibi witnesses with respect to their failure to come forward to the authorities prior to the trial. As to this matter, the trial court instructed the jury to disregard this line of questioning, informing the jury that "witnesses are not under any obligation to come forward with any evidence at any time prior to the time that they take the stand." Tr. at 321–22.

The Court finds petitioner's claim to be without merit. Subject to certain limitations, any witness is subject to probing cross-examination that is designed to test the witness's

credibility. *See, e.g.,* Fed.R.Evid. 607 ("The credibility of a witness may be attacked by any party, including the party calling the witness."). Although an alibi witness has no duty to report exculpatory information to the police, the witness's failure to disclose such information until the time of the trial "is a factor a jury should consider in assessing the weight to be given to the testimony of [the alibi] witness." *Brown v. Henderson,* 81 Civ. 6578 (CSH), 1985 WL 313, at *8 (S.D.N.Y. Feb. 28, 1985). In any event, any alleged prejudicial effect of this impeachment device would have been cured through the trial court's instructions to the jury to disregard this line of questioning.

In sum, petitioner is unable to show that he was denied a fundamentally fair trial. *See Taylor v. Curry,* 708 F.2d 886, 891 (2d Cir.), *cert. denied,* 464 U.S. 1000, 104 S.Ct. 503, 78 L.Ed.2d 694 (1983). Moreover, the Court does not regard the cumulative effect of any errors at his trial to have had a " 'substantial and injurious effect or influence in determining the jury's verdict.' " *Brecht v. Abrahamson,* — U.S. —, —, 113 S.Ct. 1710, 1722, 123 L.Ed.2d 353 (1993) (quoting *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946)); *see Flanders v. Meachum,* 13 F.3d 600, 605 (2d Cir.1994). Accordingly, the Court now will turn its attention to petitioner's remaining claims.

### C. Double Jeopardy Claim

Thomas contends that he was impermissibly subjected to double jeopardy because the trial court halted the trial on account of the unavailability of a state's witness. Specifically, he contends that on July 21, 1982 the trial court granted a mistrial after eleven jurors had been sworn, and the twelfth juror and all alternate jurors had been selected but not yet sworn. He further claims that this mistrial was granted because the state asserted that a critical witness was unavailable to testify, because he had recently undergone a surgical procedure to his mouth that rendered him unable to speak. *See* People's Ex. H (transcript of proceedings whereby mistrial was granted).

The fifth amendment right to be free of double jeopardy for the same offense applies to the states through the fourteenth amendment. *See Benton v. Maryland,* 395 U.S. 784, 794–95, 89 S.Ct. 2056, 2062–63, 23 L.Ed.2d 707 (1969). The rule is that once jeopardy attaches, the defendant generally may not be retried for the same offense in the absence of "manifest necessity." *See Illinois v. Somerville,* 410 U.S. 458, 462–64, 93 S.Ct. 1066, 1070, 35 L.Ed.2d 425 (1973).

The Supreme Court has held that in a jury trial of a criminal defendant, jeopardy will not attach until the jury has been both *empaneled and sworn. See Crist v. Bretz,* 437 U.S. 28, 35, 98 S.Ct. 2156, 2160–61, 57 L.Ed.2d 24 (1978). As the Supreme Court noted in *Crist,* it is not until this point that there arises a "need to protect the interest of an accused in retaining a chosen jury." *Id.; see Corey v. District Court of Vermont,* 917 F.2d 88, 90 (2d Cir.1990). Thus, "the federal rule of attachment in jury trials offers no basis for a double jeopardy claim if the prosecutor [as in the instant case] is successful in dismissing the prosecution before the last juror is seated or indeed before the whole panel is sworn." *Crist,* 437 U.S. at 51, 98 S.Ct. at 2168–69 (Powell, J., dissenting).

The Second Circuit Court of Appeals has addressed what is required for a jury to be "empaneled" and "sworn" for double jeopardy purposes. In commenting upon the jury selection process and the distinction between (i) the oaths that are administered to prospective jurors for purposes of voir dire, and (ii) the oath that is administered to the trial jury upon its selection, the Second Circuit noted:

The process of obtaining a jury for a trial begins with the summoning of a jury panel, a group of persons from which the trial jury is selected. When this group has assembled in the court room an oath is administered to all members that they will answer truthfully all questions concerning their qualifications as trial jurors. This oath is often called the "voir dire" oath. A jury is then selected from the group. Before the trial proper begins, an oath is administered to the jurors selected for the trial that they will truly weigh the evidence and a true verdict render according to the

evidence. This may be called the trial jury oath, to distinguish it from the voir dire oath.

*United States v. Wedalowski,* 572 F.2d 69, 74 (2d Cir.1978). In light of these distinctions, the Second Circuit in *Wedalowski* then defined what it means for a jury to be "empaneled" and "sworn" in order for jeopardy to attach. The court regarded the term "empaneled" to be synonymous to the word "selected." In addition, the court regarded the word "sworn" to refer to the trial jury oath, and not to the voir dire oath. *See id.; see also United States v. DiLapi,* 616 F.2d 613, 614 (2d Cir.1980) (Jeopardy did not attach where a jury was discharged after having been selected, but not sworn.).

Turning to the instant application, petitioner argues that jeopardy attached after eleven jurors had been sworn by the trial court, and the twelfth juror and all alternate jurors had been selected but not yet sworn. In light of the meaning accorded the terms "empaneled" and "sworn" by the Second Circuit in *Wedalowski,* it is clear that the trial court discharged the jurors before administering the trial jury oath. Therefore, jeopardy did not attach at any time prior to the trial court's declaration of a mistrial.

Further, contrary to petitioner's assertions, the trial court's reason for discharging the jurors—in this case, the purported unavailability of a key prosecution witness due to a medical condition—is irrelevant to the determination of whether jeopardy has attached. A person does not have any constitutionally protected interest in being tried by a particular factfinding tribunal until jeopardy has attached, and the Supreme Court has made clear that jeopardy does not attach in a jury trial until the entire jury has been empaneled and sworn. *See Crist,* 437 U.S. at 35–36, 98 S.Ct. at 2160–61. Thus, petitioner's double jeopardy claim must be denied.

### D. Ineffective Assistance of Appellate Counsel

Finally, petitioner asserts that his sixth amendment right to effective assistance of counsel was abridged through his appellate counsel's failure to delve into the factual underpinnings of the trial court's declaration of mistrial, and concomitantly, through his appellate counsel's failure to raise the issue of double jeopardy on petitioner's direct appeal of his conviction to the Appellate Division. Petitioner further asserts that his appellate counsel refused to pursue this line of analysis because of the limited fee that she was receiving, and that the double jeopardy issue stood the greatest possibility of success on appeal.

In order to prevail on a claim of ineffective assistance of counsel, the claimant "must show both that his counsel acted 'outside the wide range of professionally competent assistance,' and that the deficiencies of his counsel's performance were prejudicial to his defense." *Jameson v. Coughlin,* 22 F.3d 427, 429 (2d Cir.1994) (quoting *Strickland v. Washington,* 466 U.S. 668, 690, 691–92, 104 S.Ct. 2052, 2065, 2066–67, 80 L.Ed.2d 674 (1984)). This two-prong standard of review applies not only to a criminal defendant's trial counsel, but also to his appellate counsel on direct appeal. *See Evitts v. Lucey,* 469 U.S. 387, 396, 105 S.Ct. 830, 836, 83 L.Ed.2d 821 (1985); *Mayo v. Henderson,* 13 F.3d 528, 533 (2d Cir.1994); *Abdurrahman v. Henderson,* 897 F.2d 71, 74 (2d Cir.1990).

In evaluating whether an attorney's representation has fallen "below an objective standard of reasonableness," *Strickland v. Washington,* 466 U.S. 668, 688, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984), a court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689, 104 S.Ct. at 2065. "[C]ounsel has a duty to make reasonable investigations or make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691, 104 S.Ct. at 2066. In evaluating the reasonableness of counsel's decisions, however, "a heavy measure of deference [is accorded] to counsel's judgments." *Id.* In addition, "there is no constitutional right 'to have appellate counsel raise every nonfrivolous issue that the defendant requests.'" *Jameson,* 22 F.3d at 429 (quoting *Jones v. Barnes,* 463 U.S. 745, 754 n. 7, 103 S.Ct. 3308, 3314 n. 7, 77 L.Ed.2d 987 (1983)).

The second prong of the *Strickland* test requires that any deficiencies in counsel's performance be prejudicial to the defense.

See *Strickland,* 466 U.S. at 692, 104 S.Ct. at 2067. In the absence of governmental interference with counsel's assistance, or a showing that counsel is burdened by an actual conflict of interest, the claimant must affirmatively establish that he has been prejudiced through his attorney's errors. *See id.* at 692–93, 104 S.Ct. at 2067–68. While a finding of prejudice is not dependent upon a showing "that counsel's deficient conduct more likely than not altered the outcome in the case," *id.* at 693, 104 S.Ct. at 2068, the claimant nevertheless must establish "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2068. For purposes of this analysis, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id. See also id.* at 697, 104 S.Ct. at 2069–70 (Court need not address performance prong "[i]f it is easier to dispose of an ineffectiveness claim on the ground of [in]sufficient prejudice.").

Turning to the instant application, petitioner is unable to demonstrate that he has met either prong of the *Strickland* test.

First, petitioner has not introduced any evidence to show that his appellate counsel's representation fell "below an objective standard of reasonableness." *Strickland,* 466 U.S. at 688, 104 S.Ct. at 2064. The record shows that appellate counsel filed a thirty-nine-page brief in which she raised three substantive issues. She also filed a reply brief that elaborated on her original arguments while answering certain of respondent's arguments. All of these claims were supported by numerous citations to case law and the trial record, and clearly evinced the thoroughness of appellate counsel's work. Moreover, appellate counsel's decision not to pursue Thomas's double jeopardy claim was consistent with reasonable appellate strategy that, under the deferential standard of review articulated in *Strickland,* the Court is remiss to second guess. *See id.* at 691, 104 S.Ct. at 2066–67.

Furthermore, petitioner's assertion that he was prejudiced through his appellate counsel's failure to pursue a double jeopardy claim is even more attenuated that his contentions under the first prong of the *Strickland* test. As earlier discussed, petitioner has no legal foundation for asserting a double jeopardy claim in connection with the trial court's discharge of the jury before it had been empaneled and sworn because, under clearly established law, jeopardy had not attached at that time. *See supra.* In addition, petitioner is unable to escape the requirement of affirmatively showing prejudice because he has not asserted that the state interfered with his appellate counsel's representation, or that his counsel was burdened by an actual conflict of interest. *See Strickland,* 466 U.S. at 692–93, 104 S.Ct. at 2067–68. Therefore, insofar as the petitioner is unable to meet either prong of the *Strickland* test, his claim of ineffective assistance of counsel must be denied.

### CONCLUSION

For the foregoing reasons, petitioner's application for a writ of habeas corpus is denied in its entirety and the petition is dismissed. The Court finds that the petition presents no question of substance for appellate review, and therefore a certificate of probable cause to appeal will not issue. *See Rodriquez v. Scully,* 905 F.2d 24, 24 (2d Cir.1990) (per curiam).

SO ORDERED.